

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

ENTERED
03/06/2014

| | | |
|---|---|---|
| IN RE: | § | |
| **DIAMOND BEACH VP, LP** | § | **CASE NO: 12-10175** |
|     Debtor(s) | § | |
| | § | **CHAPTER 11** |
| | § | |
| **INTERNATIONAL BANK OF COMMERCE** | § | |
|     Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 12-01006** |
| | § | |
| **RANDALL J. DAVIS,** *et al* | § | |
|     Defendant(s) | § | |
| | § | |

## MEMORANDUM OPINION

Diamond Beach VP, LP was formed for the purpose of developing Diamond Beach Condominiums, a 240 unit luxury condominium project in Galveston, Texas. Diamond Beach completed 116 of these units, with financing for the land and construction provided by International Bank of Commerce. The debt to IBC was guaranteed, in part, by Diamond Beach's principal owner, Randall Davis.

For several reasons, including the devastation caused by Hurricane Ike, Diamond Beach was unable to repay IBC. A chapter 11 bankruptcy case ensued. Diamond Beach's confirmed plan of reorganization provided for the Bankruptcy Court to value Diamond Beach's unsold condominium units and undeveloped land for the purposes of establishing a deficiency claim and a claim on the Davis guaranty.

The Court determines that the value of the remaining Diamond Beach Property is $21,533,898.51. The parties have stipulated that the total owed to International Bank of Commerce is $27,578,592.89. Accordingly, the deficiency is $6,044,694.38.

## Background

### I.  History of Diamond Beach

In 2005, Houston real estate developer Randall Davis formed Diamond Beach for the purpose of developing a luxury condominium project in Galveston, Texas.  ECF No. 41 at 2.  The Diamond Beach Property originally consisted of a 7.89 acre tract of land located at 10300 Seawall Boulevard, Galveston, Texas.

On September 20, 2006, Diamond Beach executed a $41,900,000.00 real estate lien note to IBC.  Pl.'s Ex. 11.  The parties contemporaneously executed a Construction Loan Agreement.  Pl.'s Ex. 11.  The Diamond Beach Note is secured by a first lien Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement dated September 20, 2006, recorded in the Real Property Records of Galveston County, Texas.  Pl.'s Ex. 11.  IBC made two subsequent loans to Diamond Beach—an additional $10,000,000.00 on September 27, 2007, and an additional $4,000,000.00 on January 21, 2010.  Pl.'s Ex. 11.  The subsequent loans were documented by real estate lien notes, deeds of trust and continuing guaranties.  Pl.'s Ex. 11.

Randall Davis (Diamond Beach's principal owner) and Gary Leach (Diamond Beach's builder) executed guaranty agreements to IBC.  Pl.'s Ex. 11.  Pursuant to their guarantees, Mr. Davis and Mr. Leach both unconditionally guaranteed full payment of $10,000,000.00 of outstanding principal, plus all accrued unpaid interest, late charges, attorneys' fees, and all costs incurred by IBC in connection with collection of the Diamond Beach Note and enforcement of the guarantees.  Pl.'s Ex. 11.

The Diamond Beach Property is governed by the Declaration of Diamond Beach Condominium and its subsequent amendments.  Pursuant to the Declaration, Diamond Beach was to be developed in two phases.  Defs.' Ex. 7 at 5.  Article IV, Section 5.1 provides that Diamond Beach

will consist of a total of 240 Units, including 117 Units in Phase One[1] and in the event Phase Two is developed as similar Units, 123 Units in Phase Two.[2]  Defs.' Ex. 7 at 5.  Article I, Section 1.2 of the Declaration defines the term Common Elements.[3]  Defs.' Ex. 7 at 1.  Pursuant to Article V, Section 5.3, each Unit, includes an individual share of the Common Elements built on Phase One.  Defs.' Ex. 7 at 5.  Article IX, Section 9.1(a) provides that the percentage of the undivided interest in the Common Elements allocated to each Unit is based on one share to each Unit compared with the total shares allocated to all the Units in the Condominium.  Defs.' Ex. 7 at 13.  The liability for Common Elements is allocated in an identical manner.  Defs.' Ex. 7 at 14.

Diamond Beach is a Class A quality property with first class resort style amenities.  ECF No. 41 at 3; *see also* Defs.' Ex. 13.  The Diamond Beach Property has a heated indoor pool, a large bar, state of the art fitness center, a kids club, private wine room, game room, Wii room, a business center, a lazy river, the largest resort pool in Texas (over 300 feet long), outdoor cabanas and access to a private beach.  ECF No. 41 at 3; *see also* Defs.' Ex. 13.

Marketing of the Phase One units began in 2006.  In September, 2008, Hurricane Ike made landfall at Galveston, causing approximately $2,000,000.00 in damage to Diamond Beach.  ECF No. 41 at 4.  The consequences of Hurricane Ike depressed the real estate market in Galveston making it difficult to sell the condominium units in Phase One.  ECF No. 41 at 4.  Shortly after Hurricane Ike,

---

[1] 116 Units were actually constructed in Phase One.

[2] The City of Galveston issued a permit for 120 units to be constructed in Phase Two. Hearing Transcript, ECF No. 106 at 202.

[3] "Common Elements" means The Common Elements shall consist of all portions of the Property, except the Units, and including the Limited Common Elements, unless otherwise expressly specified herein. The Common Elements include, without limitation and if applicable, any of the following items located on the Property: the walls, roof, hallways, breezeways, stairways, exterior windows, entrances and exits, mechanical equipment areas, storage areas, "lazy river," grill house, swimming pool, walkways, mail boxes, fire escapes, pipes, ducts, flues, shafts, electrical wiring and conduits (except pipes, ducts, flues, shafts, electrical wiring and conduits situated entirely within a Unit and serving only such Unit), central heating and ventilating systems servicing the Common Elements, public utility lines, structural parts of the Building, and all other portions of the Property except the individual Units.  Structural columns located within the boundaries of a Unit shall be part of the Common Elements. Any reference to "Common Elements" appearing on the Plat (except reference to Limited Common Elements) shall be deemed solely for purposes of general information and shall not be limited in any way, nor shall any such reference define the Common Elements in any way. The use of the Common Elements and the right of the Unit Owners with respect thereto shall be subject to and governed by the Act, the Governing Documents and the rules and regulation of the Association. Defs. Ex. 7 at 2.

the mortgage market collapsed, exacerbating the difficulty in selling Phase One condominiums.  ECF No. 41 at 4.  Phase One was eventually completed in 2009.  While he was still the principal owner of Phase One, Mr. Davis was able to sell seventy five of the 116 units, but was unable to begin construction of Phase Two.

**II.  Events Preceding Chapter 11 Filing**

Diamond Beach was required to make monthly interest payments on the twentieth calendar day of each month.  Pl.'s Ex. 11.  The last interest payment IBC received was in May, 2011.  Pl.'s Ex. 11.  On October 18, 2011, IBC notified Diamond Beach, Mr. Davis and Mr. Leach of the default under the Diamond Beach Note, giving them ten days to cure the default.  No party timely cured the default.  ECF No. 1 at 4.

During July 2011, Mr. Davis sent one or two letters to IBC in an attempt to settle or restructure the loan and to be released from his guarantee.  Hearing Transcript, ECF No. 106 at 212.  In late 2011 through early 2012, Mr. Davis had several video conference calls with Dennis Nixon, the Chairman of IBC, in an attempt to resolve the Diamond Beach dispute.  Hearing Transcript, ECF No. 106 at 210.  During one of these video conference calls, Mr. Nixon threatened to make Mr. Davis' development career very difficult if Mr. Davis did not do what Mr. Nixon asked him to do regarding Diamond Beach.  Hearing Transcript, ECF No. 106 at 217.

Both the Diamond Beach Note and the Guaranty Agreements contained arbitration provisions requiring the parties to settle relevant disputes through arbitration.  *See* Pl.'s Exs. 2 & 4.  Despite these arbitration provisions, on March 1, 2012, IBC filed its Original Petition and Emergency Application for Appointment of a Receiver against Diamond Beach, Mr. Davis and Mr. Leach in the 165th Judicial District Court of Harris County, Texas.  ECF No. 1 at 5.  The State Court Lawsuit contained allegations that Mr. Davis and Mr. Leach were acting to defraud IBC by siphoning money into annuities and family limited partnerships.  Defs.' Ex. 64.  The State Court Lawsuit was dismissed by IBC only twelve days after it was filed, and IBC sought to resolve the dispute through

arbitration.  ECF No. 1 at 5.  However, the damage from the publicly-filed lawsuit was done.  On March 13, 2012, the Houston Chronicle published an article regarding the State Court Lawsuit and the allegations of fraud against Mr. Leach and Mr. Davis.  Defs.' Ex. 67.  Since the publication of the article, Mr. Davis has been unable to obtain financing for any large development project.[4]  Hearing Transcript, ECF No. 106 at 225.

Although these events are not directly related to the value of the condominiums, they do demonstrate that Mr. Nixon may have been implementing his threats against Mr. Davis.  Because of the very real possibility that IBC implemented Mr. Nixon's threats against Mr. Davis, the Court will skeptically review the testimony given by IBC's agents and witnesses.

### III. Procedural History

On April 2, 2012, Diamond Beach filed its voluntary chapter 11 petition (Case No. 12-10175).  Diamond Beach and IBC negotiated a Settlement Agreement that dictated the terms of Diamond Beach's chapter 11 plan.  ECF No. 1 at 5.  On July 2, 2102, the Court entered its Agreed Order Confirming Chapter 11 Plan of Liquidation.  Case No. 12-10175, ECF No. 106.  The plan incorporated the parties' Settlement Agreement.  The Settlement Agreement provided in pertinent part that:

- IBC's prepetition claim was allowed in the amount of $28,193,759.32;[5]

- The parties agreed to a valuation determination of the Diamond Beach Property by the Bankruptcy Court;

- The deficiency of the allowed IBC claim would be the difference between  $28,193,759.32 and the value of the Diamond Beach Property as determined by the Bankruptcy Court;

- The amount bid at the foreclosure sale of the Diamond Beach Property would not be dispositive of its value;

---

[4]  Mr. Davis is a well-known Houston real estate developer.  He is known for his work on the historic Rice Hotel, the Tribeca lofts, and other significant Houston-area developments.
[5]  Unit 716 closed subsequent to the settlement and the parties agreed to reduce IBC's claim by the amount of the sale, $614,166.43.  ECF No. 41 at 6 n. 2.  The agreed balance on the claim is now $27,578,592.89.  ECF No. 41 at 6 n. 2.

- The deficiency claim, if any, would be an allowed unsecured claim and would be paid as follows:

    o   Up to $2,500,000.00 in cash from Randall Davis;

    o   Up to $1,500,000.00 in cash from liquidation of annuities from Randall Davis;

    o   Up to $6,000,000.00 in an agreed judgment entered in this Adversary;

- IBC was allowed to foreclose on the Diamond Beach property in June 2012.

Pl.'s Ex. 11.

On June 5, 2012, IBC foreclosed on the unsold units in Phase One and on the undeveloped Phase Two land.  ECF No. 41 at 26.  The successful bidder was Diamond Beach Holdings, LLC, an entity owned by IBC.  Diamond Beach Holdings purchased the Diamond Beach Property for $18,000,000.00.  ECF No. 41 at 26.

IBC filed its Original Complaint on June 26, 2012.  ECF No. 1.  Diamond Beach filed its Answer on July 10, 2012.  ECF No. 11.  Mr. Davis filed his Answer on July 12, 2012.  ECF No. 12.  Trial began on May 13, 2013 and concluded on May 23, 2013.  Diamond Beach and Mr. Davis submitted their Post-Trial Brief on June 6, 2013.  ECF No. 102.  IBC submitted its Motion to Strike and Response to Defendants' Post-Trial Brief on June 21, 2013.  ECF No. 103.

### IV. Appraisers

#### A.  Stephen DuPlantis

Mr. DuPlantis is an MAI appraiser hired by IBC to appraise the Diamond Beach Property.[6] Pl.'s Ex. 32.  Mr. DuPlantis has been a real estate appraiser since 1983.  Hearing Transcript ECF No. 106 at 6.  He has worked for CBRE for sixteen years, and is presently the Senior Managing Director for its South Central Region.  Hearing Transcript, ECF No. 106 at 7-8.

---

[6] Mr. DuPlantis was a credible witness.  In part, he relied on information obtained from IBC.  For the reasons set forth above, the Court discounts information that was obtained solely from IBC.  However, there is no evidence that Mr. DuPlantis was aware of Mr. Nixon's comments to Mr. Davis.

Mr. DuPlantis determined the total value of the Diamond Beach Property to be $21,330,000.00.  Pl.'s Ex. 33 at 7.

### i.       Phase One

Mr. DuPlantis determined the value of the unsold units in Phase One by doing a gross sellout analysis based on a direct sales comparison approach.  Pl.'s Exhibit 32 at 35.  Mr. DuPlantis used five comparable developments and used the historical sales from the Diamond Beach Property.  The five comparable properties used by Mr. DuPlantis were Emerald by the Sea, Ocean Grove, Palisade Palms, Galvestonian and Islander East.  Pl.'s Ex. 32 at 37-46.  Mr. DuPlantis gave greater weight to Palisade Palms and Emerald by the Sea because they were the only developments that he also considered to be Class A.  Pl.'s Ex. 33.  Mr. DuPlantis found that Palisade Palms is superior to Diamond Beach because it is a twenty eight story hi-rise with nicer amenities and is located on an accreting beach.  Hearing Transcript, ECF No. 106 at 32.  Mr. DuPlantis made his determination of price per square foot by looking at both the current and historical sales prices for the comparable properties.  Hearing Transcript, ECF No. 106 at 32.  Mr. DuPlantis arrived at total projected gross sales for the remaining forty one units of $17,905,475.00—a price per unit of $436,718.90, and a price per square foot of $326.23.  Pl.'s Ex. 33.  Mr. DuPlantis estimated the value of the forty one remaining units in Phase One to be $13,521,891.00, which he rounded to $13,500,000.00.

Mr. DuPlantis estimated an eight quarter sell-out period for the remaining forty one units at a velocity of two units per month.  Mr. DuPlantis estimated sales commissions of 4.00% of gross sales; overhead and marketing of 2.00% of gross sales; closing costs of 2.00%; real estate taxes of $645.00 per month; condominium association fees of $998.00 per month; and an 18.00% discount rate.  The 18.00% discount rate was taken from RealtyRates.com Developer Survey, which listed the minimum and maximum discount rates of resort and second home hi-rise developments as 12.89% and 25.01%, respectively, with an average of 18.57%.  Pl.'s Ex. 32 at 56.  The survey listed the pro-forma

minimum and maximum rates as 12.38% and 24.00%, respectively, with an average of 17.83%.  Pl.'s Ex. 32 at 56.

### ii.  Phase Two

Mr. DuPlantis determined the value of the Phase Two land to be $7,830,000.00.  Pl.'s Ex. 32 at 65.  He determined that the highest and best use was a speculative land holding until adequate demand existed to justify building additional condominium units.  Pl.'s Ex. 32 at 33.  Mr. DuPlantis made this determination because of the fact that development of new condominium properties had greatly slowed due to the downturn in the real estate market.  Pl.'s Ex. 32 at 33.

### a.  Raw Land

Mr. DuPlantis determined that Phase Two consisted of 2.45 useable acres.  Pl.'s Ex. 32 at 1. Mr. DuPlantis relied upon a survey provided to him by IBC.  *See* Pl.'s Ex. 106.  Mr. DuPlantis used the sales comparison approach comparing three properties in Galveston—7211 Broadway, 8502 Seawall Boulevard and 1016 61st Street.  Pl.'s Ex. 32 at 59-60.  The prices per square foot were $11.57, $15.10 and $23.00 respectively.  Pl.'s Ex. 32 at 59.  Mr. DuPlantis made adjustments for market conditions, size, beach frontage, topography, location and land ratio to arrive at a price per square foot range of $30.00 to $35.00.  Pl.'s Ex. 32 at 61.  The value of the Phase Two raw land was calculated to be approximately $3,500,000.00.  Pl.'s Ex. 32 at 61.

### b.  Common Elements

Mr. DuPlantis used the cost approach to determine the value of the Phase One Common Elements allocable to Phase Two.  Pl.'s Ex. 32 at 63.  His estimate of the present value of the Common Elements allocable to Phase Two was $4,330,000.00.  Mr. DuPlantis determined that the total construction cost for Phase One was $55,931,660.00.  Mr. DuPlantis distinguished between two categories of Common Elements—(1) common amenities and (2) common areas.    Hearing Transcript, ECF No. 106 at 54.  Common amenities included features such as a lazy river, indoor pool, media room, etc., for which Mr. DuPlantis believed a buyer of Phase Two should be required to

pay a full pro rata share.  Hearing Transcript, ECF No. 106 at 55.  Common areas included hallways, elevators and lobby areas, for which Mr. DuPlantis believed a buyer of Phase Two should not have to pay a full pro rata share because, for instance, an owner of a condominium in Phase Two would get little to no utility out of a hallway on the seventh floor in Phase One.  Hearing Transcript, ECF No. 106 at 55.-56

Mr. DuPlantis determined that 51.00% of the cost of the common areas was marketable to a buyer of Phase Two.  Pl.'s Ex. 32 at 63.  Mr. DuPlantis determined that the reproduction cost for the common amenities was approximately $8,657,342.00, and estimated the reproduction cost for the common areas to be $15,300,848.00.  Pl.'s Ex. 32 at 63.  Mr. DuPlantis summed the total reproduction cost of the common amenities ($8,657,342.00) and the marketable portion of the common areas ($7,816,162.13) and applied a 10.00% depreciation rate.  Pl.'s Ex. 32 at 65.  Mr. DuPlantis then allocated 50.00% of the depreciated reproduction cost to Phase Two, or $7,413,077.00.  Pl.'s Ex. 32 at 65.  Finally, Mr. DuPlantis applied an 18.00% discount rate[7] and a thirty six month holding period to arrive at the estimated present value of the Common Elements allocable to Phase Two—$4,330,000.00.  Pl.'s Ex. 32 at 65.

### B.    Ronald Little

Mr. Little is an MAI appraiser hired by Mr. Davis and Diamond Beach to appraise Diamond Beach.[8]  Defs.' Ex. 4A at 1.  Mr. Little has been a real estate appraiser since 1972, and is presently employed by National Realty Consultants.  Hearing Transcript, ECF No. 96 at 166-167.

---

[7] Mr. DuPlantis' value for entrepreneurial profit is subsumed in this figure.  Hearing Transcript, ECF No. 106 at 43.

[8] The Court notes that Mr. Little was previously engaged by IBC to appraise the Diamond Beach Property. *See* Pl.'s Exs. 54-57. In a 2007 appraisal, Mr. Little valued the Phase Two land at $5,760,000.00. Hearing Transcript, ECF No. 97 at 55. Mr. Little testified that his valuation is significantly higher today because the property was under single ownership at the time and there was no reason to allocate the Common Elements to Phase Two. Hearing Transcript, ECF No. 97 at 56. Mr. Little conceded that at the time of this appraisal he believed that the Phase Two owners would have access to all of the amenities being constructed on Phase One, had the cost information for the Common Elements, and believed that Diamond Beach had entitlements from the City of Galveston to build 120 units on Phase Two.  Hearing Transcript, ECF No. 97 at 73-79.

Mr. Little determined the total value of the Diamond Beach Property to be $28,600,000.00. Defs.' Ex. 4A at 1. Mr. Little performed a discount to present value analysis on all three components of his valuation using a 10.00% discount rate and a seven quarter absorption period. Defs. Ex. 4A at 31. This seven quarter absorption period is the time he predicts it would take to sell the remaining forty one condominium units with the logic being that Phase Two would not be developed until all of the Phase One units are sold. Hearing Transcript, ECF No. 97 at 50. Mr. Little arrived at his 10.00% discount rate starting with a reported national apartment rate of 8.28%. Hearing Transcript, ECF No. 97 at 53. He believed that the discount rate for the Diamond Beach Property had to be higher than this average because a purchaser will be selling, as opposed to renting, the units. Hearing Transcript, ECF No. 97 at 53. He also believed that this was a much safer investment than if a purchaser were developing a condominium project from the ground up. Hearing Transcript, ECF No. 97 at 53. Accordingly, he began with a basic safe rate and added premiums for risk to arrive at 10.00%. Hearing Transcript, ECF No. 97 at 53.

### i. Phase One

Mr. Little used a sales comparison approach to determine the value of the forty one unsold units in Phase One. Mr. Little compared historical sales at Palisade Palms, Ocean Grove, Emerald by the Sea and Diamond Beach to arrive at an estimated value for the forty one remaining units of $15,763,402.96, with a value per unit of $448,012.00. Defs.' Ex. 4A at 25. Mr. Little began with an analysis of Palisade Palms, looking at floor height, building size and comparative features such as bedrooms and bathrooms. Hearing Transcript, ECF No. 96 at 184. He then did the same analysis with historical sales at Diamond Beach by looking at the size of the units and the listing prices— specifically for sales on the same floor. Hearing Transcript, ECF No. 96 at 184-185. His average price per square foot was computed by looking at the value for each individual unit and determining the arithmetic average. Hearing Transcript, ECF No. 96 at 185.

Mr. Little estimated that all the remaining units would be sold over seven quarters, at a rate of six units per quarter.  Defs.' Ex. 4A at 31.  He estimated sales commissions of 6.00%; marketing/management fees of 0.10%; closing costs of 0.25%; taxes for both sold units and inventory of $0.025303; HOA fees for both sold units and inventory of $10,932.00; and insurance for both sold units and inventory of 0.25%.  Defs.' Ex. 4A at 31.

### iii.    Phase Two

Mr. Little determined that the total value of Phase Two was $15,257,269.00.  He determined that the highest and best use for the Phase Two land was a future multi-family condominium development.  Defs.' Ex. 4A at 16.

### a.  Raw Land

Mr. Little determined that Phase Two consisted of 3.21 acres of raw land.  Mr. Little used the sales comparison approach to determine the value of the Phase Two raw land.  Mr. Little used eight comparable properties, and determined that the first five were the most relevant indicators of value because they were the five most recent commercial land sales on Seawall Boulevard.  Defs.' Ex. 4A at 27.  The sale price per square foot for the comparable tracts of land ranged from $9.03 to $14.60 with an average of $12.86 per square foot.  Defs. Ex. 4A at 27.  Mr. Little determined that at least a $15.00 upward adjustment in the price per square foot was necessary because no other site on Galveston Island has both seawall protection and beach access like the Diamond Beach Property.  Defs.' Ex. 4A at 28.  Mr. Little determined the value of the Phase Two land to be $32.00 per square foot.  Defs.' Ex. 4A at 28.  After applying his 10.00% discount rate over seven quarters, Mr. Little determined that the total value of the Phase Two land was $3,764,237.93.  Defs.' Ex. 4A at 28.

### b.  Common Elements

Mr. Little determined that the total development cost of Diamond Beach was approximately $50,800,349.00.  Defs.' Ex. 4A at 28.  Mr. Little's analysis provides a common area allocation for each cost ranging between 0.00% and 100.00%.  Pl.'s Ex. 66.  Mr. Little excluded from his

calculations any common areas that he did not believe a Phase Two owner would pay for such as common areas on the residential floors of Phase One.  Hearing Transcript, ECF No. 97 at 12.  He determined that the total cost allocable to the common areas was $14,261,988.00.  Pl.'s Ex 66.  He then applied the Marshall & Swift Trend Multiplier of 1.0601 to bring costs current to present value.  Pl.'s Ex. 66.  Mr. Little determined the total cost for the common areas was $15,119,133.00.  Mr. Little then applied a 4.95% depreciation rate for a depreciated common area cost of $14,370,736.00.  Pl.'s Ex. 66.  He allocated half of this amount to Phase Two to arrive at the common area costs allocable to Phase Two of $7,185,368.00.  Pl.'s Ex. 66.  He then allocated a 50.00% undivided interest in the Phase One common area land ($3,597,405.00).  After applying his 10.00% discount rate over seven quarters, Mr. Little arrived at a total value of Phase Two's undivided interest in the Common Elements of $9,071,172.06.  Pl.'s Ex. 66.

### C.  Matthew Deal

Mr. Deal is an MAI appraiser hired by Mr. Davis and Diamond Beach to appraise the Diamond Beach Property.  Defs.' Ex. 5A.  Mr. Deal has been an appraiser since 1989, and currently owns his own firm, Deal, Sikes & Associates.  Hearing Transcript, ECF No. 96 at 6-7.

Mr. Deal determined the total value of the Diamond Beach Property to be $29,320,000.00.  Defs.' Ex. 5A at 15.

### i.      Phase One

Mr. Deal applied the income capitalization approach using a discounted cash flow analysis to estimate the market value of the forty one remaining units in Phase One.  Mr. Deal used the sales comparison approach to determine the value of the individual units.  Mr. Deal determined that the value of the remaining forty one units was $14,796,953.00.  Rather than determining a price per square foot, Mr. Deal estimated a price per unit.  Hearing Transcript, ECF No. 96 at 18.  Mr. Deal felt that a value per unit was the appropriate unit of comparison because units on higher floors have a higher value, and determining the value per unit actually reflects the combination of the size and

location of each unit.  Hearing Transcript, ECF No. 96 at 19.  Mr. Deal looked at the historical sales at Diamond Beach as well as the historical sales for Palisade Palms and Emerald by the Sea.  Hearing Transcript, ECF No. 96 at 19-20.  Mr. Deal looked at the various units in the two comparable properties based on the unit size, where the unit was located in the building as well as the number of bedrooms and bathrooms, and determined an individual valuation of each unit.  Hearing Transcript, ECF No. 96 at 20.  The average price per unit was between $480,000.00 and $490,000.00, and Mr. Deal determined that an average of $470,000.00 per unit was a reasonable number.  Hearing Transcript, ECF No. 96 at 20.

Mr. Deal applied a twenty four month absorption period, estimating that five units would be sold per quarter, with six units being sold in the eighth quarter.  Mr. Deal estimated management/administrative costs to be $3,000.00 per year; closing costs to be 1.00% of unit sales; commissions to be 6.00% of unit sales; insurance to be 0.30% per units; and a 10.50% discount rate. Defs.' Ex. 5A at 12.  The property tax expense relies on Mr. Deal's estimate of the individual condominium unit price multiplied by the property tax rate.  Defs.' Ex. 5A at 12.  Mr. Deal testified that his number for management and administrative costs is a nominal amount that trends down as additional units are sold.  Hearing Transcript, ECF No. 96 at 23.  Mr. Deal indicated that the figure for closing costs is a number he has used throughout his career, which he finds to be reasonable. Hearing Transcript, ECF No. 96 at 24.

Mr. Deal testified that he arrived at his discount rate by looking at investment reports including the PricewaterhouseCoopers Korpacz investment survey.  Hearing Transcript, ECF No. 96 at 25.  The Korpacz survey provided an overall yield indicator for all property types of 8.90%, which Mr. Deal believed set the floor for the discount rate.  Hearing Transcript, ECF No. 96 at 25.  Mr. Deal believed that, because of its recreational use, the property most similar to the subject property is a hotel.  Hearing Transcript, ECF No. 96 at 25.  The survey provided a national average hotel

discount rate of 10.30%, and he believed that 10.50% was a reasonable number for the Diamond Beach Property.  Hearing Transcript, ECF No. 96 at 25.

### ii.    Phase Two

Mr. Deal determined that the total value of Phase Two was $14,523,502.00.  He determined that the highest and best use for Phase Two was a high-density waterfront development such as a condominium or hotel.  Defs.' Ex. 5A at 8.

### a.  Raw Land

Mr. Deal determined that Phase Two consisted of 3.21 acres of raw land.  He used a sales comparison approach to determine the price per square foot for the Phase Two land.  Mr. Deal used nine comparable properties.  Mr. Deal's comparable tracts sold for between $6.59 and $30.00 per square foot with an average of $14.84 per square foot.  Defs.' Ex. 5A at 14.  He then made adjustments based on the fact that the Diamond Beach Property is uniquely positioned along San Luis pass and the Galveston Island beachfront, and is just west of Seawall Boulevard.  Defs.' Ex. 5A at 14.  He determined that the value of the Phase Two raw land was $30.00 per square foot, for a total of $4,194,840.00.  Defs.' Ex. 5A at 14.

### b.  Common Elements

Mr. Deal determined the value of the Common Elements allocable to Phase Two to be $10,328,662.00.  Defs.' Ex. 5A at 14.  Mr. Deal reviewed the developer's costs and extracted the cost of the Common Elements for a total of $20,657,324.00 in costs associated with the Common Elements.  Defs. Ex. 5A at 14.  He applied a cost multiplier of 1.039 provided by Marshall & Swift Valuation Service, to bring the construction costs current as of the date of value.  Defs. Ex. 5A at 14.  Mr. Deal estimated depreciation of 5.00% and allocated 50.00% of this total to Phase Two—$10,328,663.00.  Defs.' Ex. 5A at 14.

### D.  Kim Kobriger

Kim Kobriger is an MAI appraiser hired by Mr. Davis and Diamond Beach to appraise the Diamond Beach Property.  Defs.' Ex. 3A.  He currently owns the Lewis Realty Advisors, a commercial appraisal and consulting firm.  Hearing Transcript, ECF No. 107 at 5-6.

Mr. Kobriger determined the total value of the Diamond Beach Property to be $28,160,000.00.  Defs.' Ex. 3A at 1.

#### i.    Phase One

Mr. Kobriger used a discounted cash flow analysis based on a sales comparison approach to value the forty one remaining units in Phase One.  Mr. Kobriger determined that due to the location, construction, quality, age of improvements and quantity and quality of amenities, Palisade Palms was the only primary comparable to Diamond Beach.  Defs.' Ex. 3A at 37.  Mr. Kobriger also included Emerald by the Sea because it still had new units for sale.[9]  Mr. Kobriger also used the historical sales of the Diamond Beach Property in his sales comparison analysis.  Mr. Kobriger determined that the remaining units should be sold over a three year sell-out period.  Mr. Kobriger estimated that fifteen units would be sold in year one, twenty four in year two, and two in year three.  Mr. Kobriger allocated 3.00% for selling expenses and closing costs, 2.50% for management and administrative expenses and taxes of $9,650.00 per unit.  Mr. Kobriger then applied both a 10.00% and 12.00% discount rate.  Using a 10.00% discount rate, Mr. Kobriger estimated the value of the remaining forty one units in Phase One to be $14,729,214.00.  Using a 12.00% discount rate, Mr. Kobriger estimated the value of the remaining forty one units in Phase One to be $14,292,103.00.  Mr. Kobriger then provided a reconciled value of the forty one remaining units of $14,510,000.00—which is roughly the average of $14,729,214.00 and $14,292,103.00.

---

[9] Although not discussed in his report, in his Addenda beginning at page 67 of Defendant's Ex. 3A, Mr. Kobriger also lists data for five other comparable properties—Galvestonian, Islander East, Ocean Grove, The Breakers and West Beach Grand.

Mr. Kobriger chose the 10.00% to 12.00% discount rate based on the fact that approximately 65.00% of the units in Phase One were already sold and all the amenities were already constructed. Hearing Transcript, ECF No. 107 at 26.   Mr. Kobriger felt this was an appropriate range for the discount rate because an investor would be dealing with finished units ready to be sold.   Hearing Transcript, ECF No. 107 at 26.

### ii.   Phase Two

Mr. Kobriger determined the value of the Phase Two to be $14,028,800.00.  He determined that the highest and best use was a Class A hotel.  Defs.' Ex. 3A at 35.

### a.   Raw Land

Mr. Kobriger determined that Phase Two consisted of 3.21 acres of raw land.  He used a sales comparison approach to determine the price per square foot for the Phase Two land.  Mr. Kobriger used six comparable parcels to determine the value of the Phase Two raw land.  Defs.' Ex. 3A at 45. The price per square foot ranged from between $6.59 and $17.63 with an average of $11.83 per square foot.  Defs.' Ex. 3A at 45.  Each comparable was adjusted based on property rights conveyed, financing, conditions of sale, market conditions, locations, corner influence, expenditures after sale, physical characteristics, such as size, shape, access, seawall protection and beach access.  Defs.' Ex. 3A at 52.  Mr. Kobriger also consulted with numerous brokers and landowners who indicated that Diamond Beach's location and physical attributes made it unique among other sites in Galveston. Defs.' Ex. 3A at 52.  Mr. Kobriger determined that the Phase Two raw land was valued at $30.00 per square foot, with a total value of $4,195,000.00.  Defs.' Ex. 3A at 52.  Mr. Kobriger also used the price of $30.00 per square foot as the value of the land under the amenities on Phase One.  Defs.' Ex. 3A at 53.  Mr. Kobriger estimated that the land under the amenities was approximately 3.50 acres with a value of $4,573,800.00.  Defs. Ex. 3A at 53.  Mr. Kobriger allocated 50.00% of this value ($2,285,000.00) to Phase Two.  Defs.' Ex. 3A at 53.  Mr. Kobriger chose to allocate separate value to the land underneath the amenities reasoning that otherwise, a purchaser of Phase Two would receive

the land for free, paying only for the right to use the amenities.  Hearing Transcript, ECF No. 107 at 37-39.

### b.  Common Elements

In determining the value of the Common Elements, Mr. Kobriger used the cost approach and used replacement costs parceling out (1) hard costs, (2) soft costs, and (3) change orders/contingencies.  Defs.' Ex. 3A Addenda.  Mr. Kobriger determined that either, 100.00%, 20.00% or 0.00% of the each individual hard cost was allocable to the Common Elements.  Defs.' Ex. 3A Addenda.  Mr. Kobriger determined that 20.00% of the soft costs and change orders/contingencies were allocable to the Common Elements.  Defs.' Ex. 3A Addenda.  Mr. Kobriger then added a 15.00% entrepreneurial incentive and applied a 5.00% depreciation rate to arrive at total replacement cost allocable to the Common Elements of $14,340,579.98.  Defs.' Ex. 3A Addenda.  Mr. Kobriger allocated 50.00% of this cost to Phase Two, or $7,170,000.00.  Defs.' Ex. 3A Addenda.

### E.  Appraisals Summary

The following chart summarizes the four appraisals conducted on the Diamond Beach Property:

|  | Stephen DuPlantis | Ronald Little | Matthew Deal | Kim Kobriger |
|---|---|---|---|---|
| **Total Appraisal Value** | **$21,330,000.00** | **$28,600,000.00** | **$29,320,000.00** | **$28,160,000.00** |
| **Highest & Best Use—Phase Two** | **Speculative** | **Condominium** | **Condominium or Hotel** | **Class A Hotel** |
|  |  |  |  |  |
| **Remaining 41 units—Sales Comparison** |  |  |  |  |
| Price per unit | $436,718.90 | $488,012.00 | $470,000.00 | $472,200.00 |
| Price per square foot | $326.23 | $364.55 | $351.09 | $352.74 |
| **Discounted Sellout Assumptions:** |  |  |  |  |
| Units | 41 | 41 | 41 | 41 |
| Monthly price change | 0.42% | N/A | N/A | N/A |
| Absorption period (approx. years) | 2 | 2 | 2 | 3 |
| Discount rate | 18.00% | 10.00% | 10.50% | 10.00%-12.00% |
| Commissions | 4.00% | 6.00% | 6.00% | N/A |
| Taxes | $645.00/mo./unit | $0.0253 | $0.0253 | $9,650.00/yr./unit |

|  | Stephen DuPlantis | Ronald Little | Matthew Deal | Kim Kobriger |
|---|---|---|---|---|
| Condo fees | $998.00/mo. | $10,932.00/mo. | $10,800/yr./unit | N/A |
| Closing costs (per unit) | 2% | 0.25% | 1% | N/A |
| Overhead and marketing | 2% | N/A | N/A | N/A |
| Selling expenses | N/A | N/A | N/A | 3.00% |
| Management & admin. | N/A | 0.10% | $3,000.00/yr. | 2.50% |
| Insurance | N/A | 0.25% | 0.30% | N/A |
| **Discounted sellout value** | **$13,500,000.00** | **$15,763,402.96** | **$14,800,000.00** | **$14,510,000.00** |
|  |  |  |  |  |
| **Phase Two raw land—Sales Comparison** |  |  |  |  |
| Phase Two gross land area (acres) | 2.85658 | 3.21 | 3.21 | 3.21 |
| Phase Two net/usable land (acres) | 2.45 | N/A | N/A | N/A |
| Price per square foot | $30.00-$35.00 | $32.00 | $30.00 | $30.00 |
| **Value of raw land** | **$3,500,000.00** | **$3,764,237.93** | **$4,194,840.00** | **$4,195,000.00** |
| **Common area land:** |  |  |  |  |
| Price per square foot | N/A | N/A | N/A | $30.00 x 3.5 acres |
| Value of common area land | N/A | N/A | N/A | $4,573,800.00 |
| **Allocable (50%)** | **N/A** | **N/A** | **N/A** | **$2,285,000.00** |
|  |  |  |  |  |
| **Common Elements—Cost Approach** |  |  |  |  |
| Total cost of Common Elements | $16,473,504.00 | $23,732,306.00 | $21,744,552.53 | $15,095,347.00 |
| Depreciation rate | 10.00% | 4.95% | 5.00% | 5.00% |
| Percent allocable to Phase Two | 50.00% | 50.00% | 50.00% | 50.00% |
| **Total cost allocable to Phase Two** | **$7,413,077.00** | **$9,071,172.06** | **$10,328,662.00** | **$7,170,000.00** |
| Holding period | 36 mo. | N/A | N/A | N/A |
| Discount rate | 18.00% | N/A | N/A | N/A |
| **Present value** | **$4,330,000.00** | **N/A** | **N/A** | **N/A** |

## Analysis

11 U.S.C. § 506(a)(1) provides that:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

In general, when valuing a secured claim under § 506, fair market value is the appropriate measure. *In re Scopac*, 624 F.3d 274, 284 (5th Cir. 2010). The proposed disposition or use of collateral is of paramount importance to a valuation under § 506. *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 954 (1997);[10] *see also In re Peerman*, 109 B.R. 718, 721 (Bankr. W.D. Tex. 1989) (valuation of collateral is temporal and must account for the reason of valuation and contemplated disposition of the collateral). Bankruptcy courts, as triers of fact, must identify the best way of ascertaining value based on the evidence presented. *Rash*, 520 U.S. at 965 n. 6; *see also Sutton v. Bank One, Texas, Nat'l Assoc. (In re Sutton)*, 904 F.2d 327, 330 (5th Cir. 1990) (valuation of real property determined case-by-case because of inherent vagaries in the valuation process).[11]

The three traditional approaches to determining market value are the comparable sales method, the cost method and the income method. *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 183 (Tex. 2001) (*citing Religious of the Sacred Heart v. City of Houston*, 836 S.W.2d 606, 615-617 & n. 14 (Tex. 1992)). "The goal of the inquiry is always to find the fair market value—an appraisal method is only valid if it produces an amount that a willing buyer would actually pay to a willing seller." *Estate of Sharboneau*, 48 S.W.3d at 183.

Generally, under the sales comparison approach, an appraiser analyzes sales of reasonably similar properties and then adjusts the purchase price for those properties to account for differences between the subject property and the comparable properties. *In re SCC Kyle Partners, Ltd.* 2013 WL 2903453 at *13 (Bankr. W.D. Tex. June 14, 2013).

The cost approach determines value of a property by estimating the current cost to construct a replacement for, or reproduction of, the existing structure, including an entrepreneurial incentive, deducting depreciation from the total cost and adding the estimated land value. *U.S. v. 1,604 Acres*

---

[10] *Rash* dealt with the proper application of § 506(a) when a debtor has exercised the "cram down" option provided by § 1325(a)(5)(B). The Court finds that the holding in *Rash* is generally applicable to valuations under § 506.

[11] A case-by-case determination of value is distinct from the admonishment in *Rash* against courts using a case-by-case valuation *standard* to determine value. *Rash*, 520 U.S. at 965 n. 5.

*of Land, More or Less, Situate In the City of Norfolk, Commonwealth of Virginia, and 515 Granby, LLC., et al.*, 844 F. Supp. 2d. 668, 682 (E.D. Va. 2011).

Under the income approach, net income is determined by estimating future income, deducting for expenses and applying a capitalization rate to determine the present value of future income. *Estate of Sharboneau*, 48 S.W.3d at 183; *see also In re Grind Coffee & Nosh, LLC*, 2011 WL 1301357, at *4 (Bankr. S.D. Miss. April 4, 2011).

An additional approach to valuation is the subdivision development method.  The subdivision development method values an undeveloped tract of land by calculating what a developer could expect to realize from sales of individual lots, taking into account the cost of development and discounting future revenues to present value. *Estate of Sharboneau*, 48 S.W.3d at 180.  The methodology used in this Opinion to value the Phase Two land is somewhat related to the subdivision development method.

Although not contained in his original appraisal, Mr. DuPlantis performed a hypothetical land residual analysis on Phase Two using the assumptions of Diamond Beach and Mr. Davis' appraisers. Hearing Transcript, ECF No. 106 at 71; *see also* Pl.'s Ex. 43.  Mr. DuPlantis assumed that Phase Two would consist of approximately 120 units with an average size per unit of 1,300 square feet. Hearing Transcript, ECF No. 106 at 71.  Mr. DuPlantis determined that the construction cost of Phase One, not including land, was $225.00 to $230.00 per square foot.  Hearing Transcript, ECF No. 106 at 71-72.  After factoring in soft costs, Mr. DuPlantis determined a total cost of $250.00 per square foot.  Hearing Transcript, ECF No. 106 at 72.  He determined the average retail price per unit to be $355.00 per square foot.  Hearing Transcript, ECF No. 106 at 72.  Mr. DuPlantis assumed appreciation of 3.00% and deducted closing and holding costs, applied their average discount rate of 11.00% and used a thirty month sell out period.  Hearing Transcript, ECF No. 106 at 72.  Mr. DuPlantis determined that a developer could only pay $4,900,000.00 for Phase Two.  Hearing Transcript, ECF No. 106 at 73.  His determination assumed that Phase Two was ready for

development on day one and was sold as of the date of the foreclosure. Hearing Transcript, ECF No. 106 at 73. Mr. DuPlantis' value included the value of the available amenities. Hearing Transcript, ECF No. 106 at 73.

Mr. Deal testified that the cost approach was the only appraisal method that could be used to determine the value to a Phase Two purchaser of the Phase One Common Elements. Mr. Deal testified that due to his understanding of the *City of Harlingen v. Estate of Sharboneau* case, appraisers were prohibited from applying a land residual technique. Hearing Transcript, ECF No. 96 at 160-161. Mr. Deal further stated that if not for his understanding of *Sharboneau*, the land residual method would be a valid method for determining the value of the Phase Two land. Hearing Transcript, ECF No. 96 at 161.

Mr. Little testified that using the land residual technique to value the Phase Two land is less desirable than the sales comparison approach because of the great deal of speculation related to the land residual technique. Hearing Transcript, ECF No. 97 at 9. Mr. Little stated that there would be a great deal of speculation regarding the current cost to build Phase Two, the appropriate number of units and the pricing of those units when they are sold in the future. Hearing Transcript, ECF No. 97 at 9.

In their Post-Trial Brief, Diamond Beach and Mr. Davis argue that in *City of Harlingen v. Estate of Sharboneau*, the Texas Supreme Court determined that in a case involving undeveloped land, expert opinions based on the subdivision development method are inadmissible. ECF No. 102 at 2. The Court disagrees with this interpretation of *Sharboneau*. The *Sharboneau* Court held that, based on the record before it, it was unable to determine whether there was a case where an expert opinion based on the subdivision development method would be admissible. *Estate of Sharboneau*, 48 S.W.3d at 186. While the Court found that the expert opinion based on the subdivision development method *as performed in that case* was inadmissible, it did not categorically preclude use of such a method. *Id.*

This Court recognizes that the *Sharboneau* Court was skeptical of using the subdivision development method to value undeveloped land in ordinary circumstances. *Id.* at 184. As all parties have conceded, the case before the Court is very unique. The purchaser of the Phase Two land is also purchasing the right to use the Common Elements on Phase One. Assuming that additional condominium units are eventually constructed on Phase Two, each unit owner in Phase Two will have an undivided interest in the right to use the Common Elements and will have equal liability for the maintenance of the Common Elements. Therefore a purchaser of Phase Two is not merely purchasing the Phase Two raw land. The Court must also attribute value to a purchaser's right to use the Common Elements on Phase One.

Moreover, despite some superficial similarities, the approach used by the Court to value Phase Two is not the subdivision development method. *Sharboneau* does not prohibit the use of the market analysis that the Court uses. In this instance, it is the appropriate measure of value for Phase Two. Accordingly, the Court will perform a value analysis similar to the one performed by Mr. DuPlantis in his rebuttal testimony.

## I. Credibility of Appraisers

A bankruptcy court is not bound by the expert reports or opinions of appraisers and may form its own opinion of value of the subject property. *In re Grind Coffee & Nosh, LLC,* 2011 WL 1301357, at *6. The court may accept an entire appraisal or give weight to only a portion of the report. *Id.* When competing appraisals are submitted, the court must consider portions of each report in order to arrive at a realistic market value. *Id.* When two competent appraisals presented by qualified appraisers provide widely divergent value, heightened scrutiny is appropriate. *Id.*

The Court begins its inquiry by evaluating the credibility of the four appraisers.

While the Court found Mr. Kobriger to be an honest witness, it does not find his testimony or his report to be credible.

Mr. Kobriger determined that the highest and best use for the raw land was for a Class A Hotel development.  He performed no market analysis to reach that conclusion.  He then assumed, without analysis, that the developer of a Class A Hotel would pay for one half of the cost of the Phase One amenities.  These assumptions—both fundamental to his conclusion—were done with no anchors to reality.  Because these assumptions are so important, and so flawed, the Court rejects the entirety of the Kobriger appraisal as inherently unreliable.

Mr. Kobriger provided no discount to present value factor for his valuation of the Phase Two land and amenities.  Hearing Transcript, ECF No. 107 at 48.  Mr. Kobriger testified that he thought that on the date of value someone would pay $13,650,000.00 for the Phase Two land, but could not explain why it had not been purchased when offered for $5,000,000.00.  Hearing Transcript, ECF No. 107 at 49-50.

Mr. Kobriger was unable to explain how he determined many of the figures in his report.  *See e.g.* Hearing Transcript, ECF No. 107 at 87-92.  Mr. Kobriger admitted that many of his cost allocations to common areas were merely a guess, and was unsure whether these amounts were actually allocable to common areas.  Hearing Transcript, ECF No. 107 at 114.  Additionally, he allocated many inappropriate costs to the common areas including a percentage of: the penthouse unit renovations; storage closets on the seventh floor; advertising and marketing of Phase One; sales commissions for Phase One; and interest paid to the IBC on Phase One.  Hearing Transcript, ECF No. 107 at 115-117.

When the Court asked Mr. Kobriger why he allocated 4.96 acres to Phase Two and only 2.93 acres to Phase One, he responded that he did not know the answer and had not thoroughly thought through this allocation.  Hearing Transcript, ECF No. 107 at 122-123.

The Court questioned Mr. Kobriger at length about his decision to allocate one half of the costs of the common areas to Phase Two on a project that had obviously failed.  Hearing Transcript, ECF No. 123- 132.  Mr. Kobriger stated that he had no legitimate answer to the question, but just

decided, based on his judgment, to attribute 50.00% of the common area costs to Phase Two. Hearing Transcript, ECF No. 107 at 132.

The Court found Mr. DuPlantis, Mr. Little and Mr. Deal to be credible witnesses. The Court does not agree with any one analysis in its totality, but will consider portions of each in arriving at a valuation.

## II. Value of Phase One

Based largely on Mr. Deal's valuation, the Court finds that the value of the forty one remaining units in Phase One is $14,600,000.00. Mr. Deal arrived at a price per unit by taking into consideration the size and location of each unit. Mr. Deal's comparison was done on a unit by unit basis because of the fact that units on a higher floor will typically be sold for a higher price. Mr. Deal's analysis was the most thorough and provides the most accurate value for the forty one remaining units. However, Mr. Deal's use of 1.00% for closing costs is too low. Mr. Deal testified that he has used 1.00% throughout his career and believes it to be a reasonable figure. The Court rejects this assumption and adds an additional $200,000.00 in expenses to reflect a more accurate amount for closing costs. The addition of these expenses brings the closing costs closer to those used in the DuPlantis and Little appraisals.

Mr. Little began with a similar approach as Mr. Deal—taking into account a units' location and size in his computation of the price per square foot. However, Mr. Little's analysis accounts for virtually none of the expenses required to sell the remaining units, which results in an inflated value for the units.

Mr. DuPlantis testified that his determination of price per square foot was made by looking at the price per square foot of current and historical sales prices. Mr. DuPlantis' analysis regarding the pricing for the forty one remaining units was less thorough, which resulted in an understated value of the forty one remaining units in Phase One.

Mr. Deal used a 10.50% discount rate. There was significant disagreement between the appraisers as to the correct discount rate. Mr. DuPlantis used an 18.00% discount rate, and Mr. Little used a 10.00% discount rate. Each of the appraisers arrived at their choice of discount rates by using industry publications. However, Mr. DuPlantis' 18.00% rate was the rate required by the developer of a new project. The risks undertaken by the developer of a new condominium property are vastly different from those applicable to the forty one units. There are financing, marketing, permitting, construction, and hurricane risks when one builds a new condominium on a Gulf of Mexico barrier island. All of those risks are included in the choice of a discount rate. However, many of those risks are no longer applicable to the forty one Phase One units. The Court finds that Mr. Deal's 10.50% discount rate was appropriate.

### III. Value of Phase Two

There are two preliminary disputes related to the value of the Phase Two land: (1) the highest and best use of the Phase Two land; and (2) the useable size of the Phase Two land.

#### a. Highest and Best Use

The Declaration creates some ambiguity as to whether there are any restrictions for the use of Phase Two. Mr. Davis and Diamond Beach assert that there are no restrictions as to the use of Phase Two, while IBC asserts that the Declaration limits the use of Phase Two to a condominium development. Article XI, Section 11.1 provides that the use of each Unit is restricted to that of a single family residence and accessory uses as permitted. Defs.' Ex. 7 at 15.

However, Article IX, Section 9.1(b) provides that:

> "In the event Phase Two is developed in a manner other than as similar condominium units, the obligation for common area expenses and assessments for the combined Phase One and Phase Two properties, will be allocated based on the square footage living area, and in the event Phase Two is not developed as a comparable residential structure or structures, then the Declarant or Owner of the Phase Two property and the Board will agree upon an equitable division of common area expenses and assessments for use of the shared common areas and amenities for Phase One and Phase Two."

Defs.' Ex. 7 at 14.

Accordingly, at one point, the Declaration contemplates a non-residential use. At another, it contemplates only a residential use.

Because the Court determines that the highest and best use for Phase Two is speculative holding for future condominium development, the Court makes no determination regarding whether the Declaration limits the use of the Phase Two land.

Mr. Little determined that the highest and best use of the Phase Two land was for development of a condominium. Mr. Deal determined that the highest and best use was for development of either a condominium or a hotel. Although Mr. DuPlantis determined that the highest and best use was speculative, he determined that when eventually developed, the land would be developed as additional condominium units.

Neither appraiser that determined that a hotel would be the highest and best use for Phase Two did any feasibility analysis for such development. Although the Court reaches no conclusion as to whether the Declaration permits a hotel to be built on the Phase Two land, the Court concludes that the Declaration would not allow a hotel owner to use the amenities in Phase One without reaching an agreement with the Phase One owners. There are no guidelines for what such an agreement might resemble. If the Phase Two property is built as a condominium, the allocation of the amenities is governed by the existing declaration. No witness testified about the risks of obtaining an agreement with the Phase One owners. Accordingly, there is no evidence before the Court as to how the amenities could properly be valued for hotel use. Without evidence, the Court will not attribute value to the amenities for a hotel.

Because there is substantial value in the ability to use the amenities, the Court determines that the value of the land (together with the right to use the amenities) is higher for a condominium property than for a hotel.

26 / 37

However, development will not commence in the immediate future and the land will have to be held pending future development. As of the date of value, Phase One had not been completely sold out. The three most recent condominium developments built in Galveston from 2007 to the present have either been through a bankruptcy proceeding or a distressed sale. Hearing Transcript, ECF No. 106 at 28. The totality of the testimony at trial shows that the Galveston real estate market has not reached a level of growth to support the development of 120 to 123 additional Class A condominium units.

### b. Size of Phase Two

IBC engaged Mr. Robert Ellis to conduct a land title survey of the Diamond Beach Property. Mr. Ellis determined that the total area of the Phase Two land was 2.8658 acres. Pl.'s Ex. 106. Mr. Ellis testified that he relied on a survey sketch that showed the proposed division between Phases One and Two found in the First Amendment to Declaration of Diamond Beach Condominium. Hearing Transcript, ECF No. 105 at 257; *see also* Pl.'s Ex. 109, Exhibit B. Mr. Ellis indicated that he did not include any of the land under the Lazy River in the Phase Two acreage, but attributed this land to the size of Phase One. In the sketch relied upon by Mr. Ellis, which is Exhibit B to the First Amendment to Declaration of Diamond Beach Condominium, the Lazy River appears to be included in Phase One. Pl.'s Ex. 109, Exhibit B. However, according to certain aerial photographs and maps of the Diamond Beach Property, a portion of the land under the Lazy River appears to be situated on Phase Two. *See e.g.* Defs.' Ex. 21.

Mr. Ellis determined that 18,111 square feet of the total acreage of Phase Two lies south of the vegetation line, leaving a remaining useable area of 2.45 acres. Pl.'s Ex. 106. He testified that his reason for excluding the land south of the vegetation line was based on his understanding that land seaward of the vegetation line was considered public beach. Hearing Transcript, ECF No. 105 at 268.

Mr. Davis and Diamond Beach assert that the Galveston Central Appraisal District records provide the proper calculation for the Phase Two land—3.21 acres.  They assert that all 3.21 acres, even the land under the Lazy River, should be included in determining the size of Phase Two.  The Galveston Central Appraisal District records are in error.  The Phase Two land does not include any of the land on which improvements have been constructed.  Those improvements are dedicated to the individual unit owners of Phase One.  The improvements may not be altered by a future owner of Phase Two, and may be used by a future owner only in conformance with the Declaration.

The Court's inquiry should be limited to the area of the Phase Two land that is useful to a purchaser.  There is no question that the land under the Lazy River is not useful to a purchaser of Phase Two.[12]  The purchaser of Phase Two will never be able to do anything with the land under the Lazy River or with the land underlying other amenities, and it therefore provides no value to a purchaser of Phase Two.  The Phase Two land will support 123 units.  It will not support the construction of any additional units on the land underlying the Phase One amenities.

Whether to give value to the Phase Two land that lies south of the vegetation line is a closer call.  The Diamond Beach Property is located at the westernmost edge of the Galveston Seawall.  The land on the ocean side of the vegetation land cannot be used for construction of additional condominiums, but it is undisputed that the unbuildable land is the closest beach property after the seawall as one drives west from the City of Galveston.  This unique parcel's value is obviously enhanced by its beachfront location.  Therefore the Court will conclude, for valuation purposes, that there are 2.8658 useable acres in Phase Two.

### c.  Market Value of Phase Two Land

Mr. DuPlantis determined that the value of the raw land was between $30.00 and $35.00 per square foot.  Mr. Little determined the value to be $32.00 per square foot, and Mr. Deal determined

---

[12] This conclusion is distinct from a determination of the value that a Phase Two owner will attribute to his or her right to use the Lazy River.

the value to be $30.00 per square foot.  Mr. DuPlantis' comparable tracts sold for between $11.57 and $23.00 per square foot with an average of $16.56 per square foot.  Mr. Little's sold for between $9.03 and $14.60 per square foot with an average of $12.86 per square foot.  Mr. Deal's comparable tracts sold for between $6.59 and $30.00 per square foot with an average of $14.84 per square foot. Even after taking into consideration the appraisers' adjustments for the Diamond Beach Property's unique location and features, the Court finds the range of values per square foot to be high. However, because all three appraisers generally reached a consensus regarding the value per square foot, the Court will use the value at the low end of the range—$30.00 per square foot.  When multiplied by 2.8658 acres, the total value of the Phase Two raw land, without access to the amenities, is $3,745,027.00.

### d.  Value of Phase Two Land and Amenities

The Court rejects the cost approach methodology used by the three appraisers in determining the value of the Phase One amenities to a Phase Two developer.

None of the appraisers chose to utilize a market approach to value amenities, presumably because there is no comparable market for the sale of a bankrupt condominium project that is one-half developed, with a front end investment in amenities.

Because they could not use the market approach, and did not use an incremental approach to income, the appraisers were left only with a cost approach.  The Court attributes this flawed, but uniform, approach to the limited tools normally used by appraisers.  Appraisers are taught to use the income, cost and market approaches.  When there is no income available, and no market in existence, it leaves only the cost approach.  This leaves the appraisers in a predicament akin to Maslow's Hammer—"I suppose it is tempting, if all you have is a hammer, to treat everything as if it were a nail."  Abraham H. Maslow, The Psychology of Science: A Reconnaissance 15 (Harper & Row Publishers, Inc.) 1966.  However, the cost approach is fundamentally flawed in this case.

The cost approach is utilized for value because in a normal marketplace, an asset will only be developed if the returns on development justify the development.  Fundamental economics teaches that—in a competitive marketplace—price equals marginal cost.  *Malrite T.V. of New York v. FCC,* 652 F. 2d 1140, 1151, n. 16 (2nd Cir. 1981); *Adjusters Replace-A-Car, Inc., v. Agency Rent-A-Car, Inc.,* 735 F. 2d 884, 889 (5th Cir. 1984).  In a market in which price equals marginal cost, marginal cost is obviously a reasonable proxy for price (i.e.; if A=B, then B=A).

The reason why price and cost approximate one another in a competitive market is best shown by a basic supply and demand graph.  The demand portion of the graph represents that demand for a product will decline as price of the product increases:



The demand chart merely reflects Adam Smith's common-sense economics.  The higher the price charged for a product (in our case, condominiums), the lower the demand for the product.  In the example above, a product priced at $4.00 will have very few buyers.  At $3.00, the product will have many buyers.  The same will be true for condominiums priced at $400,000.00 versus those priced at $300,000.00.  For the same condominium, more people will purchase at the lower price.

The supply side also makes common sense, but with an opposite curve.  At a higher price, more suppliers will provide the product (or the codominium):



In the hypothetical above, producers will produce far more products (or condominiums) at $4.00 (or $400,000.00) than at $3.00 (or $300,000.00). Indeed, suppliers will supply the product so long as the price of the product exceeds the marginal cost of producing the product.

When the graphs are combined, one begins to understand the appraisers' uniform error:



In the overlay, economic theory would provide that a competitive market would result in a price of the good of $3.60. The market—and not a particular supplier—dictates the price in a competitive environment. At a price of $3.60, the suppliers charging $3.80 sell no goods. And,

because price equals marginal cost, it is an error to determine the value of a good by looking at a single supplier's cost in a non-competitive environment.

As set forth above, in a competitive environment, cost is a proxy for value.  In a non-competitive environment, using cost as a proxy for value may produce irrational results.  In the absence of production of any product, one must assume that the actual supply and demand looks more like this:



In the absence of production, cost does not equate with value.  If a producer will only produce at a price above $4.00, and a buyer will only buy at a price below $4.00, then cost does not equal value.

Yet, that is precisely what all of the appraisers did.  In a market with no production, they assume that historic cost equaled value.  It is as if, examining the chart set forth above, the appraisers located a producer whose marginal cost of production was $4.60, and although no one will purchase the product at $4.60, the appraisers determined that that the value of the production was $4.60.  It is flawed economics, not adopted in this opinion.

An informed business person will not spend $10,000,000.00 on amenities that produce a $100,000.00 annual rate of return.  In a capitalist economy a producer (in this case the putative developer of the 123 condominiums) will not produce a product with an expected sales price that is below the producer's expected cost (in this case, the cost of construction, interest, marketing, land and the cost of accessing the Phase One amenities).  If cost exceeds price, producers will not produce.  If price exceeds cost, producers will produce.

One cannot assume that cost equals value in the absence of price.  Normally, an appraiser can utilize cost because in a normal market, cost is a proxy for value.  But, in a failed project (Phase One having lost millions of dollars) cost is the antithesis of a proxy of value.  Cost, if misused, can produce an irrational value.  If cost were the proper measure of value, Phase One would have sold for its cost rather than losing millions of dollars.

By using the cost of Phase One amenities as a proxy of the value to Phase Two, all of the appraisers fell into the same logical error.  Buyers may enjoy the amenities, no matter how elaborate. The issue for value is whether the buyers will pay a sufficient premium for the units to justify paying as much for the amenities as they cost.

An example may be helpful.  Assume that each condominium can include door hardware manufactured from platinum at a cost of $20,000.00 per unit.  Further assume that the market will pay a $4,000.00 premium for platinum door hardware.  The platinum hardware would have a cost of $20,000.00, but a value of $4,000.00.  The appraisers have mistakenly assumed that the platinum hardware will have a value of $20,000.00.  The Court will not adopt this error.

The amenities do not independently produce income; they enhance income.  None of the appraisers attempted to determine the enhancement to income from the availability of the Phase One amenities.  As set forth below, the Court has utilized the evidence at trial to determine a value based on a modified income approach.

To determine the value of the land plus the amenities in a to-be-built Phase Two, the Court first determined the likely sales price of the to-be-constructed units in Phase Two. The Court then determined the forecast cost of building, financing and marketing Phase Two, without the elaborate amenities package. The difference in those two amounts properly reflects the combined value of the land and amenities.

Under these circumstances, the Court determines the value of the land and amenities as follows:

1.    The Court utilizes the market approach to determine the price at which the Phase Two condominium units will be sold.

2.    From the gross sales prices of the Phase Two units, the Court deducts the costs of sale, resulting in net sales proceeds.

3.    From the net sales proceeds, the Court deducts the forecast cost of construction of Phase Two, ignoring all costs already expended on the amenities on Phase One. This amount results in available cash flows in the forecast years, applying an income approach.

4.    The available cash flows are discounted to present value, also applying the income approach.

5.    The resulting value represents the combined value of the land and the right to use the Phase One amenities ("Present Value of Land and Amenities").

6.    The Court will compare this value with the market value of the Phase Two land, $3,745,027.00. If the market value of the Phase Two land exceeds the Present Value of Land and Amenities, the Court will assume that the Phase Two land will be sold without the anticipation of the use of the Phase One amenities and the market value of the Phase Two land will be used as the value for Phase Two. If the market value of the Phase Two land is less than the Present Value of Land and Amenities, the Court will assume that the value of Phase Two is equal to the Present Value of Land and Amenities.

In rebuttal testimony Mr. Davis testified that he believes that a range of $385.00 to $390.00 per square foot is an accurate figure for sales of the Phase Two units. Hearing Transcript, ECF No. 97 at 168. The present range of completed sales is $350.00 to $355.00 per square foot. As Mr. Davis indicates, a majority of these sales occurred in an abnormal market. Hearing Transcript, ECF No. 97 at 168. In looking at the nine sales that occurred at Diamond Beach in 2009, the average price per square foot was $373.63. Defs.' Ex. 4A at 21. The Court accepts the midpoint of Mr. Davis' range,

$387.50 per square foot, as a starting point for determining the future sales of the Phase Two units. The Court recognizes that the $387.50 figure is higher than the average forecasts used by the appraisers for the sale of the forty one units remaining in Phase One.  But, this price recognizes (i) a normal market; (ii) the passage of time, with normal levels of price increases; (iii) the availability of the Phase One amenities; and (iv) prior sales at similar, albeit slightly lower, levels.

Mr. Little determined that the average size per unit was 1,280 square feet.  *See* Pl.'s Ex. 66. Assuming that Phase Two is constructed as 123 condominium units, the total saleable building area is forecast to be 157,440 square feet, with gross sales for the Phase Two units of $61,008,000.00.

Relying on Mr. Deal's figures for expenses for the sale of the forty one remaining units in Phase One, the Court next subtracts 15.00% in selling costs from the projected gross sales for a total of $51,856,800.00 in net sales.  Mr. Little testified that the price of the units will likely increase by approximately 10.00%.  Hearing Transcript, ECF No. 97 at 135.  Accounting for this 10.00% appreciation, the net sales total $57,042,480.00.  Mr. Little testified that it will take approximately two years to sell the 123 units.  Mr. Little testified that in order for an investor to develop a condominium project from the ground up, he would need to realize between a 15.00% and 20.00% return.  Hearing Transcript, ECF No. 97 at 161.  Mr. Davis testified that an 18.00% to 20.00% return on Phase Two was a realistic expectation.  Hearing Transcript, ECF No. 106 at 310.  Accordingly, the Court determines that the proper discount rate is 18.00%.[13]  This provides a total in net present value for gross sales of $48,341,084.75.

Mr. Little's determination of cost of construction of Phase Two was the most logical. Hearing Transcript, ECF No. 97 at 35.  Mr. Little's cost to build Phase One, not including the common areas, was $39,218,366.00.  Pl.'s Ex. 66.  He then applied the Marshall and Swift Multiplier of 1.0601 to bring the costs current for a total of $41,575,390.00 ($39,218,366.00 x 1.0601) for the

---

[13] The Court will apply the 18.00% discount rate over a one year period, which is the average rate of absorption in a two year absorption period.

construction costs of the 116 units in Phase One.  Pl.'s Ex. 66.  When applied to 123 units, the total

cost will be $44,084,249.74.  Based on Mr. Little's testimony, the Court will subtract one half of the

construction interest ($1,452,476.50), all of the engineering costs ($724,587.00) and $500,000.00 in

marketing costs for a net cost of $41,407,186.24.[14]

This produces the following results:

| | | |
|---|---|---|
| Gross Sales Proceeds for 123 units | $57,042,480.00 | |
| Present value reduction by one year | ($8,701,395.25) | |
| Present value of sales proceeds | | $48,341,084.75 |
| | | |
| Construction costs without land | $44,084,249.74 | |
| Less engineering, marketing, and ½ of interest | ($2,677,063.50) | |
| Net construction costs | | $41,407,186.24 |
| | | |
| **NET PROCEEDS** | | **$6,933,898.51** |

The Court rejects Mr. Davis's rebuttal testimony that the experts have overstated the

construction costs on the Phase One units.  The data utilized by all of the experts was provided

through Mr. Davis and his staff.  In rebuttal, Mr. Davis gave conclusory testimony that the costs were

overstated.  Indeed, he testified that the actual cost of construction would be dramatically less than

the amount actually spent on Phase One.

Mr. Davis gave no specifics, and failed to attempt to reconcile his guesses with the actual

data.  Because Mr. Davis is generally a credible witness, the Court struggles to understand the

discrepancy.  Perhaps Mr. Davis was talking about the cost of building on a gross square footage

basis (including hallways, elevator shafts, and the like).  Perhaps his per square foot costs include the

---

[14] Mr. Little testified that the approximately $41,000,000.00 in cost to build Phase One included the engineering costs for both phases.  Hearing Transcript, ECF No. 97 at 142. He also testified that he would not be surprised if the interest cost included in Phase One was much higher than it would be if the project were financed today or several years from now. Hearing Transcript, ECF No. 97 at 142. Mr. Davis testified that after Hurricane Ike, Diamond Beach launched a marketing program in an attempt to bring people back to Galveston. Hearing Transcript, ECF No. 106 at 206.  The costs for the post-hurricane marketing should not be considered in the cost of building Phase Two. Further, Mr. Little testified that because Phase Two will be marketed as a "spin off" of Diamond Beach, the marketing costs for Phase Two will be lower than for Phase One. Hearing Transcript, ECF No. 97 at 143. Mr. Little agreed that in determining that costs to build Phase Two, it was fair to take out all of the engineering costs, reduce interest by half and reduce marketing costs by $500,000.00. Hearing Transcript, ECF No. 97 at 143.

square footage of balcony space.  Because his testimony lacked detail, the Court will not credit this portion of his testimony.  The per square foot costs used by the experts, and now by the Court, are all based on the total costs, exclusive of amenities, divided by the square footage of saleable area.  The Court will not reject the reality of Phase One costs in favor of an unsupported guess, even if the guess is by a credible witness.

Based on these figures, the Court determines that the Present Value of Land and Amenities is $6,933,898.51.

**Conclusion**

The Court concludes as follows:

1.     The total value of the Diamond Beach Property is $21,533,898.51 ($14,600,000.00 + $6,933,898.51).

2.     The deficiency balance remaining on the Diamond Beach Property is $6,044,694.38.

3.     Pursuant to the Settlement Agreement, IBC will collect $2,500,000.00 in cash from Randall Davis and $1,500,000.00 in cash from liquidation of annuities from Mr. Davis.

4.     A judgment in the amount of $2,044,694.38 will be entered against Mr. Davis and Diamond Beach.

5.     IBC will have a remaining unsecured claim in Diamond Beach's bankruptcy in the amount of $2,044,694.38 after application of the funds in paragraphs 3 and 4 above.

The Court will enter a judgment consistent with this Memorandum Opinion.

SIGNED **March 6, 2014.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE